IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

OHIO VALLEY ENVIRONMENTAL COALITION,
WEST VIRGINIA HIGHLANDS CONSERVANCY,
WEST VIRGINIA RIVERS COALITION,
and SIERRA CLUB,

        Plaintiffs,

v.          CIVIL ACTION NO.  2:15-1371

FOAL COAL COMPANY, LLC,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

In an order dated February 27, 2017, the Court granted Plaintiffs' Motion for Partial Summary Judgment. ECF No. 64. The Court reserved its discussion of the bases for that decision for a later opinion. The following Memorandum Opinion and Order sets forth the Court's reasons for granting Plaintiffs' Motion.

**I.   BACKGROUND**

Plaintiffs Ohio Valley Environmental Coalition ("OVEC"), West Virginia Highlands Conservancy, West Virginia Rivers Coalition, and Sierra Club filed this case pursuant to the citizen suit provisions of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. §§ 1251–1388, and the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. §§ 1201–1328. Compl., ECF No. 1. Before proceeding to the parties' arguments, the Court will first discuss the relevant regulatory framework and then the factual background of this case.

    **A.   Regulatory Framework**

The primary goal of the CWA is "to restore and maintain the chemical, physical, and

biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To further this goal, the Act prohibits the "discharge of any pollutant by any person" unless a statutory exception applies; the primary exception is the procurement of a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. §§ 1311(a), 1342. Under the NPDES, the U.S. Environmental Protection Agency ("EPA") or an authorized state agency can issue a permit for the discharge of any pollutant, provided that the discharge complies with the conditions of the CWA. 33 U.S.C. § 1342. A state may receive approval to administer a state-run NPDES program under the authority of 33 U.S.C. § 1342(b). West Virginia received such approval, and its NPDES program is administered through the West Virginia Department of Environmental Protection ("WVDEP"). 47 Fed. Reg. 22363-01 (May 24, 1982). All West Virginia NPDES permits incorporate by reference West Virginia Code of State Rules § 47-30-5.1.f, which states that "discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by [West Virginia Code of State Rules § 47-2]." This is an enforceable permit condition. *See, e.g., Ohio Valley Envtl. Coal., Inc. v. Fola Coal Co., LLC*, 82 F. Supp. 3d 673, 676 (S.D. W.Va. 2015), *aff'd*, 845 F.3d 133 (4th Cir. 2017).

West Virginia's water quality standards include two narrative water quality criteria, which are designed to protect uses of West Virginia's streams related to aquatic life. Those criteria provide:

> 3.2. No sewage, industrial wastes or other wastes present in any of the waters of the state shall cause therein or materially contribute to any of the following conditions thereof:
> . . .
> 3.2.e. Materials in concentrations which are harmful, hazardous or toxic to man, animal or aquatic life;
> . . .
> 3.2.i. Any other condition, including radiological exposure, which adversely alters the integrity of the waters of the State including wetlands; no significant adverse

> impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems shall be allowed.

W. Va. Code R. §§ 47-2-3.2.e–3.2.i.

Coal mines are also subject to regulation under the SMCRA, which prohibits any person from engaging in or carrying out surface coal mining operations without first obtaining a permit from the Office of Surface Mining Reclamation and Enforcement ("OSMRE") or an authorized state agency. 30 U.S.C. §§ 1211, 1256, 1257. A state may receive approval to administer a state-run surface mining permit program under the authority of 30 U.S.C. § 1253. In 1981, West Virginia received conditional approval of its state-run program, which is administered through the WVDEP pursuant to the West Virginia Surface Coal Mining and Reclamation Act ("WVSCMRA"). W. Va. Code §§ 22-3-1 to -33; 46 Fed. Reg. 5915-01 (Jan. 21, 1981). Regulations passed pursuant to the WVSCMRA require permittees to comply with the terms and conditions of their permits and all applicable performance standards. W. Va. Code R. § 38-2-3.33.c. One of these performance standards requires that mining discharges "shall not violate effluent limitations or cause a violation of applicable water quality standards." *Id.* § 38-2-14.5.b. Another performance standard mandates that "[a]dequate facilities shall be installed, operated and maintained using the best technology currently available . . . to treat any water discharged from the permit area so that it complies with the requirements of subdivision 14.5.b of this subsection." *Id.* § 38-2-14.5.c.

### B. Factual Background

This controversy concerns discharges from a surface mine along the southern portion of the Leatherwood Creek watershed. The mine at issue, Fola's Monoc #2 Surface Mine, is located in Clay and Nicholas Counties, West Virginia and is situated on the other side of Leatherwood Creek from Fola's Surface Mine No.2 and near Fola's Surface Mine No. 4A and No. 6, all situated along Leatherwood Creek. Stipulation, ¶ 1, ECF No. 48. The latter three mines were the subject of

prior litigation between Plaintiffs, save the West Virginia Rivers Coalition, and Fola. *See Ohio Valley Envtl. Coal. v. Fola Coal Co., LLC*, 120 F. Supp. 3d 509 (S.D. W. Va. 2015). In that case this Court found that Fola violated it CWA and SMCRA permits for the No. 2 and No. 6 mines by discharging highly conductive water into two tributaries of Leatherwood Creek. *Id.* at 544–46.

The Monoc #2 mine area contains two valley fills. Valley fill #1 partially fills Elick Hollow which drains into Pond #1 and then from Outlet 005 into Elick Hollow of Leatherwood Creek. Stipulation, ¶ 2. Valley fill #2 partially fills Shanty Branch which drains into Pond #2 and then from Outlet 011 into Shanty Branch of Leatherwood Creek. *Id.*

Defendant's mining activities at the Monoc #2 mine are regulated under West Virginia Surface Mining Permit S6019-89 and WV/NPDES Permit WV1009290. *Id.* ¶¶ 4, 5. Both permits were transferred from Vandalia Resources to Fola in 2002 in the case of the former and 2004 for the latter. WVDEP reissued WV/NPDES Permit WV1009290 in April 2013. *Id.* ¶ 5. It limits discharges from Outlets 005 and 011. *Id.* Outlet 005 is the only point source in Elick Hollow and Outlet 011 is the only point source in Shanty Branch. *Id.*

Before mining began, Fola reported that conductivity in Elick Hollow measured 35 µS/cm while conductivity in Shanty Branch measured 44 µS/cm. *Id.* ¶ 7. After mining began Fola measured levels of conductivity at Outlets 005 and 011 and at instream monitoring points in Leatherwood Creek. *Id.* ¶ 8. From 1992 to 2000 Fola measured highly conductive discharges of water from Outlets 005 and 011. *Id.* (showing discharges from Outlets 005 and 011 consistently ranging from 1000 µS/cm up to 4000 µS/cm.). Instream levels of conductivity in Leatherwood Creek downstream from Outlets 005 and 011 were also extremely high. *Id.* (showing instream conductivity consistently ranging from approximately 500 µS/cm to 3000 µS/cm with a general trend toward increasing conductivity over time). From 2008 to the present Fola has measured

conductivity at Outlets 005 and 011 consistently ranging from approximately 1000 µS/cm to approximately 2000 µS/cm. *Id.* ¶ 9.

Plaintiffs moved for partial summary judgment on jurisdictional issues and general causation. Pls.' Mot. for Part. Summ. J., ECF No. 49, *see also* Pls.' Mem. Supp. Mot. Part. Summ. J., ECF No. 50. Plaintiffs assert that they have standing as a matter of law through their members James Tawney, Cindy Rank, and Angie Rosser. *Id.* Plaintiffs also contend that they have met the statutory requirements for jurisdiction under the CWA and SMCRA, and that Fola is estopped from relitigating this Court's prior findings that ionic pollution as measured by conductivity meets the general causation element of liability under both the CWA and SMCRA. Fola tendered a tepid response to Plaintiffs' motion. Response, ECF No. 53. Fola, in a footnote, takes no position on whether Plaintiffs have standing, only reminding the Court that Plaintiffs have the burden of proving standing, and it did not challenge Plaintiffs assertion that they have met the statutory requirements for suit. *Id.* Fola's response merely attempts to narrow the scope of Plaintiffs' estoppel argument such that it is only estopped from relitigating general causation of ionic pollution on stream impairment.

## II.  LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*


*Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his position. *Anderson*, 477 U.S. at 252.

"'[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 822 (D. Md. 1998) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "Thus, if the movant bears the burden of proof on an issue, . . . he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Having discussed the standard for review of motions for summary judgment, the Court now turns to the parties' arguments concerning standing.

### III.  JURISDICTIONAL ISSUES

#### A. Constitutional Standing Requirements

In order to bring any action in federal court, a plaintiff must have standing—that is, a plaintiff must have a sufficient personal stake in the outcome of the matter being litigated to make it justiciable under Article III of the Constitution. *See Friends of the Earth, Inc. v. Gaston Copper*

*Recycling Corp.* ("*Gaston Copper I*"), 204 F.3d 149, 153 (4th Cir. 2000); *see also* U.S. Const. art. III (restricting federal courts to adjudicating "cases" and "controversies"). In order to satisfy the minimum constitutional requirements for standing, an individual plaintiff must demonstrate:

> (1) [he] has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). In environmental cases, "a plaintiff need only show that he used the affected area, and that he is an individual 'for whom the aesthetic and recreational values of the area [are] lessened' by the defendant's activity." *Piney Run Pres. Ass'n v. Cnty. Comm'rs*, 268 F.3d 255, 263 (4th Cir. 2001) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735 (1972)). Furthermore, "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at 181.

As this Court explained in *OVEC v. Maple Coal Company*, a court is not required to determine the merits of the environmental violations alleged when deciding if standing exists. 808 F. Supp. 2d 868, 882 (S.D. W. Va. 2011) (citing *Laidlaw*, 528 U.S. at 181). "What [standing] does require is a demonstration that if the allegations of Clean Water Act violations are true, the impacts of the alleged violations are felt in an area with which the plaintiffs have 'a direct nexus.'" *Id.* (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.* ("*Gaston Copper II*"), 629 F.3d 387, 395 (4th Cir. 2011)). Plaintiffs "may rely on circumstantial evidence such as proximity to polluting sources, predictions of discharge influence, and past pollution to prove both injury in fact and traceability." *Gaston Copper I*, 204 F.3d at 163. To require more would contravene the otherwise "straightforward Clean Water Act issue of whether [the defendant] has violated its permit limitations," thereby "throw[ing] federal legislative efforts to control water pollution into a

time warp by judicially reinstating the previous statutory regime in the form of escalated standing requirements." *Id.* at 163–64.

When the plaintiff in question is an organization, that organization "has standing to sue on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

### B. Application of Constitutional Standing Requirements

Plaintiffs claim to satisfy standing requirements through their members James Tawney, Angie Rosser, and Cindy Rank. Mr. Tawney and Ms. Rank are members of the West Virginia Highlands Conservancy, the Ohio Valley Environmental Coalition, and the Sierra Club. Pls.' Ex. 4 ¶¶ 2-3, ECF No. 49-4; Pls' Ex. 5 ¶¶ 2, 5, 7, ECF No. 49-5. Ms. Rosser is a member of the West Virginia Rivers Coalition. Pls.' Ex. 6 ¶ 2, ECF No. 49-6. Plaintiffs' members are not simply members of environmental advocacy groups. Each member that submitted an affidavit are West Virginians who reside in communities near the areas allegedly affected by Fola's discharges. Like many of their neighbors, they value the natural beauty and resources of West Virginia, such as our streams and rivers and, like many of their fellow citizens, they have joined local organizations dedicated to preserving those resources.

As explained below, the Court finds that through the declarations of Mr. Tawney, Ms. Rank, and Ms. Rosser, Plaintiffs readily satisfy standing requirements.

#### 1. Injury in fact
James Tawney grew up in Clay County, West Virginia. Pls.' Ex. 4 ¶ 1, ECF No. 49-4. Throughout his childhood and to this day he has visited and fished in the Elk River, into which

Leatherwood Creek flows. *Id.* ¶¶ 9–12. Due to pollution from Fola's mining operations, Mr. Tawny has stopped fishing at the confluence of Leatherwood Creek and the Elk River. *Id.* ¶ 10. In addition, though Mr. Tawney previously fished in Leatherwood Creek, he has since stopped fishing the creek out of concern about pollution from Defendant's surface mine operations. *Id.* Mr. Tawney expressed particular concern over the high conductivity discharges from these mines. *Id.* ¶¶ 11–12. In addition to recreational visits, Mr. Tawney also visits Leatherwood Creek when visiting his stepmother's nearby grave. *Id.* ¶¶ 13–14. Mr. Tawny explained, "[i]t is insulting that the peaceful setting chosen for my stepmother's eternal rest is disturbed by the destruction of the environment in the area—including the pollution of the nearby streams." *Id.* ¶ 14.

Like Mr. Tawney, Ms. Rank has also been a long-standing visitor to the Elk River, regularly traveling along the river since the 1970s. Pls.' Ex. 5 ¶ 12–13, ECF No. 49-5. Ms. Rank has been visiting Leatherwood Creek since 2003 or 2004, but her enjoyment of the creek has been limited by her knowledge of pollution from Defendant's surface mine operations. *Id.* ¶¶ 15–26.

Ms. Rosser lives along the Elk River about twelve miles downstream from the confluence of the Elk and Leatherwood Creek. Pls.' Ex. 6 ¶ 4, ECF No. 49-6. Ms. Rosser has capitalized on her proximity to the river by regularly swimming in, and boating and floating on, the Elk. *Id.* ¶ 5. Recently, however, she has stopped fishing on the Elk due to the pollution discharged from Fola mining operations along Leatherwood Creek and refuses to swim near the confluence of the Elk and Leatherwood Creek because of the pollution. *Id.* ¶¶ 11, 13. She would resume fishing on the Elk, including near the mouth of Leatherwood Creek, were pollution to abate. *Id.* ¶ 14. Ms. Rosser plans to continue to use the Elk and visit the mouth of Leatherwood Creek. *Id.* ¶ 15.

Mr. Tawney, Ms. Rank, and Ms. Rosser all use the area affected by Defendant's discharges and all have suffered the loss of aesthetic and recreational value. In summary, Ms. Rank, Mr.

Tawney, and Ms. Rosser have demonstrated a concrete and actual harm to their aesthetic and recreational interests as a result of ionic pollution in Leatherwood Creek.

### 2. Traceability

Plaintiffs' injuries are fairly traceable to Defendant's discharges of ionic pollution in alleged violation of its WV/NPDES Permit because the declarants claim that their injuries resulted from elevated pollution in the same waterway into which Defendant discharges pollutants. *OVEC v. Marfork Coal Co., Inc.*, No. 5:12-cv-1464, 2013 WL 4509601, at *5 (S.D. W. Va. Aug. 23, 2013). Defendant does not argue that the areas used by Plaintiffs' declarants in Leatherwood Creek are not affected by its mining and discharges. Therefore, traceability has been shown.

### 3. Redressability

The Court finds that Plaintiffs also satisfy the final standing element, redressability. Plaintiffs seek injunctive relief requiring Defendant to reduce its discharge of ionic pollution to comply with the terms of its permit. This relief would provide redress for declarants' injuries by reducing the amount of ionic pollution in Leatherwood Creek. It is not necessary that such relief completely relieve every injury suffered by Mr. Tawney and Ms. Rank; relieving the impacted waters from the ionic pollution, but not *all* pollution, is adequate redress for standing purposes.

### 4. Organizational Standing

The Court finds that Plaintiffs have constitutional standing. Declarants are members of all of the plaintiff organizations. They have demonstrated: (1) injuries in fact which are (2) fairly traceable to Defendant's alleged violations and which (3) are able to be redressed by a favorable decision in this case. These three declarants support Plaintiffs' organizational standing because, (A) as individual members, they would have standing to sue in their own right, (B) the interests Plaintiffs seek to protect are germane to Plaintiffs' overall purpose to conserve and preserve the environment and natural resources, and (C) neither the claims asserted nor the relief requested requires the participation of individual members.

### C. Statutory Requirements for Citizen Suit

Under the CWA and SMCRA, no citizen suit may be commenced prior to the provision of sixty days' notice to the alleged violator, the Administrator of the EPA (for CWA citizen suits) or the Secretary of the Department of the Interior (for SMCRA citizen suits), and the State in which the alleged violation occurs. 30 U.S.C. § 1270(b)(1)(A); 33 U.S.C. § 1365(b)(1)(A). The notice must provide:

> sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a) (notice requirement for CWA citizen suit); *see also* 30 C.F.R. § 700.13(e) (notice requirement for SMCRA citizen suit). Providing such notice "is a mandatory condition precedent to filing suit under [the CWA]." *Gaston Copper II,* 629 F.3d at 399 (citing *Hallstrom v. Tillamook Cnty.,* 493 U.S. 20, 31 (1989)). "Without adequate notice, the Court does not have subject matter jurisdiction to hear the case." *Assateague Coastkeeper v. Alan & Kristin Hudson Farm,* 727 F. Supp. 2d 433, 437 (D. Md. 2010) (citation omitted). The purpose of the notice is to "allow a potential defendant to identify its own violations and bring itself into compliance voluntarily," *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York,* 273 F.3d 481, 488 (2d Cir. 2001) (citations omitted), and to "[allow] Government agencies the opportunity to take responsibility to enforce the environmental regulations," *Assateague Coastkeeper,* 727 F. Supp. 2d at 437 (citing *Hallstrom,* 493 U.S. at 29). Accordingly,

> [A]s long as a notice letter is reasonably specific as to the nature and time of the alleged violations, the plaintiff has fulfilled the notice requirement. The letter does not need to describe every detail of every violation; it need only provide enough information that the defendant can identify and correct the problem.

*San Francisco Baykeeper, Inc. v. Tosco Corp.,* 309 F.3d 1153, 1155 (9th Cir. 2002). "The

sufficiency of the plaintiffs' notice letter must be assessed based on the facts that existed" at the time notice was provided. *Gaston Copper II,* 629 F.3d at 401.

The parties do not dispute that Plaintiffs have satisfied their statutory obligation to provide sixty days' notice. Plaintiffs sent a letter postmarked November 12, 2014, providing notice of their intent to sue unless Fola complied with its WV/NPDES permit. Pls.' Ex. 2, Decl. of Michael Becher, ECF No. 49-2. Plaintiffs filed the pending Complaint on February 2, 2015, over sixty days later. Compl., ECF No. 1. Accordingly, the Court further finds that Plaintiffs have satisfied the statutory citizen suit notice requirements.

## IV. COLLATERAL ESTOPPEL

Plaintiffs contend that Fola should be collaterally estopped from relitigating the issue of the general causation of impairment by high levels of conductivity. To support their argument they point to two previous cases decided by this Court that both held that high conductivity associated with surface mining was a general cause of impairment. Pls.' Mem. Supp. Mot. Part. Summ. J. 13, ECF No. 50; *see also Ohio Valley Envtl. Coal. v. Fola Coal Co., LLC*, 82 F. Supp. 3d 673, 686–96 (S.D. W. Va. 2015) (Stillhouse Branch), *aff'd*, 845 F.3d 133 (4th Cir. 2017); *Ohio Valley Envtl. Coal. v. Fola Coal Co., LLC*, 120 F. Supp. 3d 509, 515–37 (S.D. W. Va. 2015) (Leatherwood Creek). Fola does not categorically oppose Plaintiffs' motion. Fola does not dispute that high levels of conductivity generally cause impairment; that is, high levels of conductivity may cause or materially contribute to impairment. Fola disputes any contention in Plaintiffs' briefing that asserts that high levels of conductivity caused impairment in this case and that any particular level of conductivity necessarily causes impairment. Fola's critiques of Plaintiffs' motion, at bottom, imply concerns over specific causation. The Court does not take Plaintiffs' motion to move for anything more than to preclude the relitigation of the general causation element. Thus, it seems Fola's

concerns are unfounded and both parties agree that general causation need not be relitigated in this case. Nonetheless, the Court will make an independent determination whether general causation has already been established by this Court's prior rulings.

"Collateral estoppel forecloses the relitigation of issues of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom issue preclusion is asserted had a full and fair opportunity to litigate." *Sedlack v. Braswell Servs. Grp., Inc.*, 134 F.3d 219, 224 (4th Cir. 1998) (quoting *Ramsay v. INS*, 14 F.3d 206, 210 (4th Cir. 1994)). The proponent of collateral estoppel must establish:

> (1) the issue sought to be precluded is identical to one previously litigated; (2) the issue must have been actually determined in the prior proceeding; (3) determination of the issue must have been a critical part of the decision in the prior proceeding; (4) the prior judgment must be final and valid; and (5) the party against whom estoppel is asserted must have had a full and fair opportunity to litigate the issue in the previous forum.

*Id.* The parties largely agree that general causation in this case has been established by this Court's two prior cases addressing conductivity from surface mine runoff in Appalachian streams. Indeed, the general causation issue meets all five elements of collateral estoppel.

The issue sought to be precluded here is identical to two previous cases decided by this Court. In *Ohio Valley Environmental Coalition, Inc. v. Fola Coal Co., LLC* the plaintiffs brought a case challenging Fola's compliance with NPDES permits for Stillhouse Branch. 82 F. Supp. 3d at 676. The plaintiffs asserted that Fola breached the terms of its permits by discharging highly conductive water into Stillhouse Branch. *Id.* In order to prevail the plaintiffs were obliged to prove that high conductivity associated with surface mining activity is a general cause of impairment. *Id.* at 686. This Court found, after a three-day bench trial, that the plaintiffs demonstrated by a preponderance of the evidence that high levels of conductivity associated with surface mining can cause impairment. *Id.* at 696.

The Court again took up the general causation issue in *Ohio Valley Environmental Coalition v. Fola Coal Co., LLC*. 120 F. Supp. 3d 509. There plaintiffs brought another challenge to Fola's NPDES permits permitting discharges into Leatherwood Creek and certain tributaries that flow into Leatherwood Creek along its southern bank. *Id.* at 513–14. Leatherwood Creek and two other tributaries (Shanty Branch and Elick Hollow) that flow into Leatherwood along its northern bank are the subject of this case. The plaintiffs again contended that Fola had violated the terms of its permits by discharging highly conductive water into Leatherwood Creek and its tributaries. *Id.* After a three-day bench trial the Court found "[o]n the basis of [an] outstanding collection of peer-reviewed studies, the Court finds that the link between surface mining and biological impairment of downstream waters has been sufficiently—if not definitively—established in the scientific literature." *Id.* at 511, 537. Specifically the Court found "Plaintiffs proved by a preponderance of the evidence that conductivity, as a measure of a consistent mix of ions typical of alkaline mine drainage in the Appalachian region, may cause or materially contribute to biological impairment to aquatic life . . . ." *Id.* at 515.

The issue of general causation here has all the same features as the general causation issues already determined by this Court. This case involves allegedly highly conductive discharges from Fola's surface mining operation into tributaries of Leatherwood Creek along its northern bank. Indeed, this Court has already determined general causation for highly conductive discharges into Leatherwood Creek. The case before the Court now is simply challenging discharges into tributaries on the other side of Leatherwood from the earlier Leatherwood case. Defendants do not protest that this case raises any general causation issues that are factually or legally distinct from those already decided. Similarly, there is nothing in the record that would lead the Court to determine that the general causation issue raised here is not the same as the general causation issue

already proved in the two prior cases addressing highly conductive mine drainage as measured by a consistent mix of ions typical of alkaline mine drainage in the Appalachian region.

In both the Leatherwood Creek case and the Stillhouse Branch case, the Court made specific factual findings after hearing testimony from dueling experts and reviewing large quantities of scientific data about general causation. *See id.* at 515–37; *Ohio Valley Envtl. Coal.*, 82 F. Supp. 3d at 686–96. In both cases the Court actually determined that a consistent mix of ions typical of alkaline mine drainage in the Appalachian region as measured by conductivity can cause impairment. *Id.* The general causation determination was a threshold issue in each case; that is, had plaintiffs in either case failed to prove that it is possible that conductivity can cause impairment, plaintiffs would not have been able to prove either of their cases. Both the Stillhouse case and Leatherwood case are valid final judgments, and Fola had a full and fair opportunity to litigate the issue twice and did so vigorously in each case. Accordingly, collateral estoppel applies to the general causation issue in this case. Fola had a full and fair opportunity to litigate the issue in two prior cases, and the Court actually decided this identical threshold issue in a valid final judgment after hearing extensive testimony and reviewing mountains of scientific data.

## V. CONCLUSION

For the foregoing reasons the Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment. ECF No. 49.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER: April 4, 2017

_____
ROBERT C. CHAMBERS, CHIEF JUDGE