IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

SIERRA CLUB and WEST VIRGINIA
HIGHLANDS CONSERVANCY,

     Plaintiffs,

     v.                                Civil Action No. 2:10-1199

FOLA COAL COMPANY, LLC,

     Defendant.

_____

OHIO VALLEY ENVIRONMENTAL
COALITION, WEST VIRGINIA
HIGHLANDS CONSERVANCY and
SIERRA CLUB,

     Plaintiffs,

     v.                                Civil Action No.  2:13-5006

FOLA COAL COMPANY, LLC,

     Defendant.

_____

OHIO VALLEY ENVIRONMENTAL
COALITION, WEST VIRGINIA
HIGHLANDS CONSERVANCY and
SIERRA CLUB,

     Plaintiffs,

     v.                                Civil Action No. 2:13-21588
                                         (consolidated with 2:13-16044)

FOLA COAL COMPANY, LLC,

     Defendant.

_____

OHIO VALLEY ENVIRONMENTAL
COALITION, WEST VIRGINIA

**HIGHLANDS CONSERVANCY, WEST
VIRGINIA RIVERS COALITION, and
SIERRA CLUB,**

      Plaintiffs,

      v.                           Civil Action No. 2:15-1371

**FOLA COAL COMPANY, LLC,**

      Defendant.

## CONSENT DECREE

## I. RECITALS

1.      On October 11, 2010, Sierra Club and West Virginia Highlands Conservancy filed a complaint for declaratory and injunctive relief and for civil penalties in Civil Action No. 2:10-1199 against defendant Fola Coal Company, LLC ("Fola") for violations of WV/NPDES Permit WV1014005 and Surface Mining Control and Reclamation Act (SMCRA) Permit S2009-95 at Fola's Surface Mine #3. On February 9, 2012, the Parties entered into a Consent Decree to resolve the alleged violations of the Clean Water Act and SMCRA. Under that Decree, Fola was allowed to conduct a habitat restoration project at Boardtree Branch, to attempt to restore the stream's biological integrity. Civil Action No. 2:10-1199, ECF Doc. 66 at ¶¶ 30-31. On December 1, 2015, a Special Master of Biology determined that biological integrity had not been restored to Boardtree Branch. *See* 2:10-1199 ECF Doc. 100. As a result, Fola was required to submit a schedule for completion of a Treatment or Abatement System to an appointed Special Master of Engineering. Civil Action No. 2:10-1199, ECF Doc. 66 at ¶ 41. Since 2016, Fola has been working with the Special Master of Engineering to implement an Abatement System, pursuant to the Decree.

2.      On March 13, 2013, Ohio Valley Environmental Coalition, West Virginia

Highlands Conservancy and Sierra Club filed a complaint for declaratory and injunctive relief

and for civil penalties against Fola in Civil Action No. 2:13-5006 for violations of WV/NPDES

Permit WV1014005 and SMCRA Permit S2009-95 at Fola's Surface Mine #3.  Civil Action No.

2:13-5006, ECF Doc. 1.  The Court held a trial on liability issues on August 19 through August

22, 2014.  *See* ECF Docs 97 through 101.  On January 27, 2015, the Court issued a

Memorandum Opinion and Order finding that Plaintiffs had established that Fola had committed

at least one violation of its permits.  *See* ECF Doc. 123.  On October 6, 2015, the Court held a

second trial to hear evidence regarding an appropriate remedy.  *See* ECF Doc. 166.  On

December 8, 2015, the Court issued an Order Specifying Relief and appointed a Special Master

to implement measures necessary to reduce conductivity in Stillhouse Branch or achieve

compliance with the water quality standard for biological integrity in that stream.  The Court did

not order civil penalties.  ECF Doc. 183.[1]  The Parties have been working with the Special

Master on remedial issues since early 2016.

       3.      On June 27, 2013, the Ohio Valley Environmental Coalition, West Virginia

Highlands Conservancy and Sierra Club filed a complaint for declaratory and injunctive relief

and for civil penalties against Fola in Civil Action No 2:13-16044 for violations of WV/NPDES

Permits WV1018001 and WV1013840 as well as SMCRA Permits S2011-99 and S2012-93 at

Fola's Surface Mine # 2 and Surface Mine #6.  *See* Civil Action No. 2:13-16044, ECF Doc. 1.

       4.      On August 8, 2013, the Ohio Valley Environmental Coalition, West Virginia

Highlands Conservancy and Sierra Club filed a complaint for declaratory and injunctive relief

and for civil penalties against Fola in Civil Action No. 2:13-21588, for violations of WV/NPDES

---

[1] On January 25, 2016 Fola appealed this Court's decision to the Fourth Circuit Court of
Appeals. *See* ECF Doc. 187.  After briefing and oral argument on all issues of the appeal, the
Fourth Circuit issued an Opinion and Judgement on January 4, 2017, affirming the district court.
*See* ECF Docs. 224 and 225.

Permit WV1013815 and SMCRA Permit S2005-02 at Fola's Surface Mine #4A. *See* Civil

Action No. 2:13-21588, ECF Doc. 1. On September 10, 2014, in response to a motion for jury

trial by Fola Cola Company, plaintiffs amended their complaint to drop claims for civil penalties.

*See* Civil Action No. 2:13-21588, ECF Doc. 39.

      5.      On March 17, 2014, upon motion by the parties, the Court consolidated Civil

Action Nos. 2:13-16044 and 2:13-21588, and designated Civil Action No. 2:13-21588 as the lead

case. Civil Action No. 2:13-21588, ECF Doc. 17. From June 1, 2015 to June 4, 2015, the Court

conducted a bench trial on issues related to liability in the two cases. On August 12, 2015, the

Court held that Fola had committed at least one violation of permits related to Surface Mines # 2

and # 6, but that Plaintiffs had not established liability for violations at Surface Mine 4A. ECF

Doc. 119. On May 9 and 10, 2016, the Court conducted a bench trial to determine an appropriate

remedy. *See* ECF Docs. 152, 153. On June 7, 2016, the Court appointed a Special Master to

oversee the implementation of a remedy for violations at Surface Mines #2 and #6. ECF Doc.

161. Since his appointment, the Parties have been working with the Special Master on remedial

issues.

      6.      On February 2, 2015, the Ohio Valley Environmental Coalition, West Virginia

Highlands Conservancy, the West Virginia Rivers Coalition, and Sierra Club, filed a complaint

for declaratory and injunctive relief against Fola alleging violations of WV/NPDES Permit

WV1009290 and SMCRA Permit S6019-89 at Fola's Monoc #2 mine. Civil Action No. 2:15-

1371, ECF Doc. 1. Plaintiffs did not seek civil penalties. *See id.* On March 14 and 15, 2017, the

Court conducted a trial on issues related to liability. *See* ECF Docs. 67 and 68. On May 26,

2017, the Court issued a Memorandum Opinion and Order finding that Fola had committed at

least one violation of its permits. ECF Doc. 84. On October 19, 2017, the Court appointed a

Special Master to oversee the implementation of a remedy for permit violations at the Monoc #2 Mine.  Since his appointment, the Parties have been working with the Special Master on remedial issues.

7.      This Consent Decree is intended to be a global resolution of Plaintiffs' claims against Defendant in Civil Action Nos. 2:10-cv-1199, 2:13-5006, 2:13-21588 (consolidated with 2:13-16044), and 2:15-cv-1371.  As described in paragraph 14, nothing in this Decree shall preclude the continuation of existing Civil Action No. 2:17-3013, so long as Southeastern Land Co is substituted for Fola as Defendant in that action. .  The Decree is designed and intended to maximize benefits to streams impacted by ionic pollution associated with coal mining in central Appalachia.  Plaintiffs' academic experts have been involved at all stages in developing the instant Decree and believe it would provide significant improvements to water (e.g. reduction in conductivity) and other environmental resources in the Kanawha River watershed (the same watershed in which the mines that were the object of each of the actions are located.)

8.      The Parties recognize, and the Court by entering this Decree finds, that the Decree has been negotiated in good faith by the Parties, will avoid further litigation, and that this Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

II.     **JURISDICTION AND VENUE**

9.      For purposes of this Decree, the Parties agree that this Court has jurisdiction over the Parties and over the subject matter of these actions pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 33 U.S.C. § 1365 (CWA citizen suit provision) and 30 U.S.C. § 1270 (SMCRA citizen suit provision).

10.     Venue is proper in the Southern District of West Virginia, pursuant to 28 U.S.C. §

1391(b) and (c), because it is the judicial district in which Fola's business is located, and/or in

which the violations alleged in each of the complaints in these actions occurred.  Moreover,

venue is appropriate pursuant to 33 U.S.C. § 1365(c)(1), because the sources of the alleged CWA

violations are located in this judicial district.  Venue is appropriate pursuant to 30 U.S.C. §

1270(c) because the coal mining operations complained of are located in this judicial district.

11.     For purposes of this Decree, or any action to enforce this Decree, Fola consents to

this Court's jurisdiction over the claims addressed in the Decree and consents to venue in this

judicial district.

### III.    APPLICABILITY

12.     The provisions of this Decree apply to and are binding upon Plaintiffs, those with

authority to act on their behalf, including, but not limited to, their officers, directors, and staff;

upon Fola and any of its respective successors and/or assigns; and upon other persons or entities

otherwise bound by the law.

### IV.    DEFINITIONS

13.     Terms used in this Consent Decree that are defined in the CWA, SMCRA, or

regulations issues pursuant thereto shall have the meaning assigned to them therein, unless

otherwise provided by this Decree.  Whenever the terms set for below are used, the following

definitions shall apply:

a.     "CWA" shall mean the federal Clean Water Act, 33 U.S.C. §§ 1251 *et*

*seq.*;

b.     "Day" shall mean a calendar day, unless expressly stated to be a business

day.  In computing any period of time, where the last day would fall on a Saturday, Sunday, or

federal holiday, the period shall run until the close of business the next business day;

        c.      "Decree" or "Consent Decree," when capitalized, shall mean this document;

        d.      "Defendant" shall mean Fola Coal Company, LLC;

        e.      "Effective Date" shall mean the date upon which this Consent Decree is entered by the Court or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

        f.      "Experimental Practice Projects" means new or innovative reclamation or stream mitigation techniques developed or implemented by Appalachian Headwaters, in consultation with experts, including those in the fields of reclamation of mined areas, forestry, aquatic habitats, entomology, water chemistry, and stream rehabilitation and enhancement in the course of carrying out the Reclamation Projects under this Decree.

        g.      "Funds" shall be the payments to Appalachian Headwaters from Defendant described in paragraph 17;

        h.      "Paragraph" shall mean a portion of this Decree identified by an Arabic numeral;

        i.      "Parties" shall mean Plaintiffs and Defendant collectively;

        j.      "Permits" shall mean WV/NPDES Permit Nos. WV1014005, WV1018001, WV1013840, and WV1009290 and SMCRA Permit Nos. S2009-95, S2011-99, S2012-93, and S6019-89.

        k.      "Plaintiffs" shall mean the Ohio Valley Environmental Coalition, Inc.; West Virginia Highlands Conservancy, Inc.; the West Virginia Rivers Coalition; and the Sierra Club.

7

l.      "Reclamation Projects" are reclamation projects meant to enhance or improve existing mined land reclamation and developed or implemented by Appalachian Headwaters in the course of carrying out this Decree and further described in Section V.

m.      "Section" shall mean a portion of this Decree identified by a Roman numeral;

n.      "SMCRA" shall mean the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201, *et seq*;

o.      "USEPA" shall mean the United States Environmental Protection Agency;

p.      "WVDEP" shall mean the West Virginia Department of Environmental Protection; and,

q.      "WV/NPDES permit" shall mean a West Virginia/National Pollutant Discharge Elimination System permit issued by the WVDEP pursuant to Section 402 of the CWA.

## V.      MINED LAND RECLAMATION PROJECTS

14.      Plaintiffs shall not file any new lawsuits, or otherwise seek remedies in court from Defendant, its parent company, Consol Energy, or other subsidiaries of Consol Energy under the CWA or SMCRA, for violations of permit effluent limits or narrative water quality standards associated with the discharges of sulfates, TDS, ionic pollution, or elevated conductivity on any of the Permits listed in this Decree.  This paragraph shall not be interpreted to prevent the continuation of Civil Action No. 2:17-3013 involving Fola Mine 4A, currently pending in the Southern District of West Virginia, provided that Plaintiffs move and the Court orders that Southeastern Land Co. be substituted for Fola as the Defendant in that action.  Fola agrees to join that motion.

8

15.     Prior to taking any action to enforce any alleged breach of the prohibitions in paragraph 14 on the filing of lawsuits or seeking remedies in court, Defendant, Consol Energy, or any subsidiary of Consol Energy shall provide Plaintiffs written notice of, and a thirty-day opportunity to cure any such alleged breach.  In the event of any such notice, Plaintiffs will cooperate with Defendant and/or its affiliate to have any such action, objection, opposition, or other claim for relief withdrawn or dismissed.  In no event shall Defendant, Consol Energy, or any subsidiary of Consol Energy seek money damages for breach of a provision of paragraph 14, other than legal or other fees associated with defending against any such breach, and only if Plaintiffs fail to withdraw or dismiss the action alleged to breach the agreement.

16.     To improve water quality and offset environmental degradation resulting from Defendant's CWA and/or SMCRA violations, and other impacts from coal mining, the Parties agree to pursue Experimental Practice Projects and Reclamation Projects in the region.

17.     To achieve the above-stated goals, the Parties agree to the following:

a.      Defendant will pay $3,000,000 to Appalachian Headwaters within 7 days of the Effective Date of this Consent Decree.  Subsequent payments of Funds shall be made by Defendant to Appalachian Headwaters according to the following schedule:  $2,000,000 within 1 year from the Effective Date of this Consent Decree; $3,000,000 within 2 years from the Effective Date of this Consent Decree; and, $1,000,000 within 3 years from the Effective Date of this Consent Decree.

b.      Appalachian Headwaters shall use the Funds paid under this Paragraph for the following purposes:

i. to design Reclamation projects, discussed below;

ii. to manage and pay for Reclamation Projects, produce and buy materials

for the projects, and provide general support for the organization,

   iii.  to seek additional funds for water and land reclamation in the Kanawha River watershed,

   iv.  to obtain timber rights in support of Reclamation Projects,

   v.  for environmental education about water and land reclamation in the Kanawha River watershed; and;

   vi.  to pay expert consultants to help design, implement and monitor Reclamation Projects.

The Funds shall not be used to support litigation related to coal mining and/or related activities.

18.    Plaintiffs have designated Appalachian Headwaters to act on their behalf to design and implement Reclamation Projects, as defined in this Decree. Each Reclamation Project shall have a goal of returning streams and the land to a natural and well-functioning forest ecosystem and reducing conductivity in nearby streams, while simultaneously allowing for environmentally sustainable recreation and commercial activities.

19.    Appalachian Headwaters will initially use Funds to restore land in the Kanawha River watershed identified as the as the "Sharps Knob Project." The Sharps Knob Project is a shovel-ready project on land owned by the U.S. Forest Service and identified as a high priority conservation area within the Kanawha River watershed. The Sharps Knob Project would result in the restoration of 462 acres, more or less, of formerly surface-mined land to a native forest ecosystem. The U.S. Forest Service has provided a project proposal for the Sharps Knob Project, which is included as Exhibit A to this Decree.

20.    In addition to the Sharps Knob Project, Appalachian Headwaters will work to identify and pursue additional projects in the watersheds affected by mines in the Decree.

Priority for the Reclamation Projects shall be as follows, in descending order of priority:

        a.      Restoration of mined land within the Leatherwood Creek and/or

Twentymile Creek watersheds, which drain into the Kanawha River watershed;

        b.      Restoration of mined land within the Elk and/or Gauley River watersheds,

which drain into the Kanawha River watershed;

        c.      Restoration of mined land within the Kanawha River watershed.

Selected projects shall be on sites where land has been left un-reclaimed, or where prior

reclamation resulted in poorly reclaimed grass or shrub land.  Each project selection site shall be

assessed according to Reclamation Project goals of restoring native hardwood forest to the site

and to reducing conductivity and other pollutants associated with mine drainage.

## VI.    EFFECT OF BANKRUPTCY

        21.     The undersigned agree that obligations in this Decree are not dischargeable

through bankruptcy, and Defendant agrees not to seek such a discharge and will join Plaintiffs in

efforts to avoid any such discharge.

## VII.    PARENT COMPANY GUARANTY

        22.     The ultimate parent company of the Defendant, currently Consol Energy, Inc.,

shall provide a Parent Company Guaranty, in the form attached hereto as Exhibit B, for the full

amount of Funds due under paragraph 17 and for any other payments or value that remain

outstanding at any given time.  The Guaranty shall be effective on the Effective Date of this

Decree, and shall be submitted to Plaintiffs within three (3) days of the Effective Date.  The

Parties shall adjust the written amount set forth in the Parent Company Guaranty at least

annually to reflect payments that have been made to satisfy the obligations in paragraph 17.  In

the event of a dissolution of the Defendant corporation, all obligations of this Decree shall

immediately become obligations of its parent corporation, Consol Energy, Inc.  In the event of a merger, stock sale, or other transaction where a new entity becomes the Defendant's ultimate parent company, or the parent company of Consol Energy, Inc., Defendant agrees that it shall cause such new ultimate parent company to provide a parent company guaranty in the same form as that attached as Exhibit B of this Decree within thirty days of the closing of such merger, stock sale, or other transaction.  If Defendant fails to secure the required parent company guaranty from the new owner, all obligations then remaining shall be accelerated such that any remaining Funds due under paragraph 17 shall be paid in full within 30 days of the closing of the merger, stock sale, or other transaction.

## VIII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

23.     This Consent Decree resolves all claims by Plaintiffs against Defendant in Civil Action Nos. 2:10-1199, 2:13-5006, 2:13-21588 (consolidated with 2:13-16044), and 2:15-1371. As described in paragraph 14, nothing in this Decree shall preclude the continuation of existing Civil Action No. 2:17-3013, so long as Southeastern Land Co. is substituted for Fola as Defendant in that action. Further, Plaintiffs shall comply with the restrictions of paragraph 14 on the filing of new lawsuits.

24.     This agreement does not represent an admission of liability by Defendant. Defendant and its affiliate companies reserve all rights to oppose Plaintiffs' legal theory in other cases.

25.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Decree.

## IX.   COSTS AND FEES

26.     The Parties recognize and agree that Defendant has made timely payments of

costs and attorneys' fees pursuant to Court orders in Civil Action Nos. 2:13-5006, 2:13-21588 (consolidated with 2:13-16044), and 2:15-1371 and as agreed upon in the original Consent Decree in Civil Action No. 2:10-1199. The Parties agree that they will not seek to amend, challenge, or modify the amounts paid under those orders and the original Consent Decree in 2:10-1199. Additionally, Plaintiffs agree not to seek additional costs or attorneys' fees in any of the cases encompassed in this Decree, except as specifically set forth in paragraph 27 below.

27.     Defendant shall pay Plaintiffs' reasonable fees and costs for work related to the Special Master's duties in Civil Action Nos. 2:10-1199, 2:13-5006, 2:13-21588 (consolidated with 2:13-16044), and 2:15-1371 that have not already been paid. Further, Defendant shall pay Plaintiffs' reasonable fees and costs for their work negotiating and drafting this Decree. The total of fees and costs described in this paragraph shall not exceed $90,000.

## X.     NOTICES

28.     Unless otherwise specified herein, whenever notifications, submissions, reports, or communications are required by this Decree, they shall be made in writing and addressed as follows:

To Plaintiffs:

Mike Becher
Appalachian Mountain Advocates
P.O. Box 11571
Charleston, WV 25339

and

Joe Lovett
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901

To Defendant:

13

Matthew Tyree
Senior Counsel
CONSOL Energy Inc.
1000 CONSOL Energy Drive
Suite 100
Canonsburg, PA 15317

and

Shane Harvey
Jackson Kelly PLLC
500 Lee Street E
Suite 1600
Charleston, WV 25301

29.     Any Party may, by written notice, change its designated notice recipient or notice address provided above.

30.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Decree or by mutual agreement of the Parties, in writing.

## XI.     RETENTION OF JURISDICTION

31.     The Court shall retain jurisdiction over these cases until the termination of this Decree, for the purposes of resolving disputes arising under the Decree or entering orders modifying this Decree, or effectuating or enforcing compliance with the terms of this Decree.

32.     Except as explicitly provided herein, Plaintiffs and Defendant reserve all legal and equitable rights and defenses available to them to enforce or defend the provisions of this Decree.

## XII.    MODIFICATION

33.     The terms of this Decree may be modified only by a subsequent written agreement signed by all Parties. Where the modification constitutes a material change to the

14

Decree, it shall be effective only upon approval by the Court.

## XIII.   TERMINATION

34.      The Decree shall terminate when all the Funds required to be paid pursuant to paragraph 17 have been paid.

## XIV.   SIGNATORIES/SERVICE

35.      Each undersigned representative of Plaintiffs and Defendant certifies that he or she is fully authorized to enter into the terms and conditions of this Decree and to execute and legally bind the party or parties he or she represents to this Decree.

36.      This Decree may be signed in counterparts and its validity shall not be challenged on that basis.

## XV.    INTEGRATION

37.      This Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Decree and supersedes all prior agreements and understandings, whether oral or written concerning the settlement embodied herein.  The Decree specifically supersedes the original Consent Decree filed in Civil Action No. 2:10-1199, Doc. 66.

## XVI.   FINAL JUDGMENT

38.     Upon approval and entry of this Decree by the Court, this Decree shall constitute the final judgment of the Court as to Plaintiffs and Defendants for the claims resolved herein. The Court finds that there is no just reason for delay and therefore enters this judgement as final judgment pursuant to Fed. R. Civ. P. 54 and 58.

ENTERED:  ____5/6____, 2019

_____


For the Plaintiffs Ohio Valley Environmental Coalition, Inc., West Virginia Highlands Conservancy, Inc., West Virginia Rivers Coalition, and Sierra Club


/s/ Joe Lovett                                                                    Dated: May 3, 2019
JOSEPH M. LOVETT (WV Bar No. 6926)
J. MICHAEL BECHER (WV Bar No. 10588)
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
304-793-9007


For the Defendant Fola Coal Co., LLC


/s/ M. Shane Harvey                                                       Dated: May 3, 2019
M. SHANE HARVEY (WV Bar No. 6604)
JACKSON KELLY PLLC
1600 Laidley Tower
Post Office Box 553
Charleston, West Virginia 25322
304-340-1006

# Exhibit A

*Sharp Knob Abandoned Mined Land Restoration – Scope of Work*

The Sharp's Knob project area consists of approximately 462 acres of land that were mined for coal prior to becoming part of the National Forest system. The project area is located approximately 3.5 miles southwest of Slatyfork, in Pocahontas and Randolph counties at the headwaters of the Elk and Gauley watersheds. The area was mined prior to the implementation of the Surface Mining Control and Reclamation Act of 1977 which set environmental standards that mines must follow while operating, and achieve when reclaiming mined land.

Within the project area, the top of the mountain or the "overburden" was broken up and removed by blasting in order to reach coal seams. Once the rock surrounding the coal was blasted off, in what is known in the industry as "shoot and shove," the excess rock and earth was dumped over the side of the mountain. Many of the remaining soils appear degraded and heavily compacted. In addition, the mined areas were planted with predominately nonnative trees (especially red pine), grasses, and forbs. As a result, the areas are now covered with a thick mat of nonnative grass or a monoculture of red pine and other nonnative conifers. This is a permanent condition referred to as 'arrested succession," Native trees and shrubs are unlikely to recolonized without intervention. In addition, these areas provide little quality wildlife habitat due to the lack of vegetation diversity and structural complexity of the even-aged stands. Despite this unnatural condition, this area is popular to the general public, mountain bikers, and hunters.

Prior to mining activities, this high elevation area was a red spruce-northern hardwood ecosystem. Red spruce dominated as much as 500,000 acres in West Virginia prior to the exploitive logging era of the late 19th and early 20th centuries. Today, less than 10 percent remains in the state. The remarkable red spruce ecosystem is home to over 300 rare plant and animal species. Because of this exceptionally high biodiversity, red spruce forest and wetland communities are ranked as having some of the highest global conservation priorities.

The short term goals of the project are to provide early successional habitat (high stem density) for wildlife species dependent on this type of habitat, remove approximately 462 acres of nonnative species, and create high quality pollinator habitat. The long term-goal of the project is to restore the native red spruce-northern hardwood ecosystem within the project area and improve watershed health.

Compacted ground will be loosened by a large bulldozer which will also break up the nonnative grasses mats. Soil decompaction is accomplished by pulling one or two, three-foot ripping shanks, fully immersed into the soil, behind a large bulldozer. The project area will be ripped by first ripping back and forth across the site on 8' spacing between rips. The bulldozer operator then orients the bulldozer perpendicularly to the first lines of rips and rips the entire site back and forth a second time on 8' spacing to create a cross-hatch pattern. Cross-ripping loosens soils to create a better rooting medium for trees, allowing tree roots to extend in multiple directions and improving sites' hydrologic characteristics. Some exposed soil will result temporarily after ripping, which reduces herbaceous competition and allows planted seedlings to establish. However, the bare soil is often quickly colonized by native plant species, increasing biodiversity and initiating the natural succession process.

After cross-ripping, volunteer and professional tree planters will plant a diverse mix of native tree and shrub seedlings. This mix will be composed of some fast-growing, early successional trees and shrubs (e.g. aspen, elderberry, hazelnut, et al.) and slower-growing red spruce and hardwoods. Fast growing trees, especially aspen, will quickly transform this open land to one that is covered with dense patches of young trees. The locations' elevations (>4,000 ft.) and their proximity to existing mature forests and patches of grasses and herbaceous vegetation will provide the young forest habitat with horizontal and vertical gradients. Wildlife including white-tailed deer, black bear, ruffed grouse, saw-whet owls, snowshoe hare, and many other species will flourish in these young forests. Aspen grow quickly, but they don't live very long (for a tree). Red spruce and northern hardwoods, much longer-lived species, will eventually overshadow the aspen and dominate the site. Over the following centuries, these trees will naturally change the land making it more like it was before mining. This more mature forest will create conditions suitable for at-risk wildlife like the Northern goshawk and West Virginia northern flying squirrel who require red spruce habitat. Restoration activities will also help to reduce sedimentation and revitalize key habitat for native brook trout and other stream inhabitants.

Vernal wetlands will be constructed within the mined lands using an excavator. Wetland areas will be created and each could be one pond or a series of small depressions that are hydrologically connected. Wetland size will generally be in the < 1/10th acre range; however, size can vary depending upon site conditions. Creation of these wetland types tends to be "organic" and is dictated by the landscape and other variables encountered once the digging begins. Indicators of wetness will be used to identify the location for creation and local clay or low permeability soils will be utilized to prevent seepage. After excavation of the depression is completed, exposed soils will be seeded with an annual cover crop to prevent erosion or protected with wood mulch. As ponding/saturation occurs, transplants of native wetland species will be placed in the wetlands. Vernal ponds are seasonal or temporary wetlands and will periodically dry up. Vernal pools serve as essential breeding habitat for many species of wildlife, especially salamanders and frogs.

The entire project area falls into Management Prescription (MP) 4.1- Spruce and Spruce-Hardwood Ecosystem Management under the 2006 Forest Plan. This Management Prescription calls for restoration and management of red spruce and spruce-hardwood communities in the Central Appalachians.  The desired conditions for this area as prescribed in the Forest Plan are a "mosaic of spruce and spruce hardwood communities. Restoration management focuses on achieving spruce and mixed spruce species composition, as well as developing the multi-age stand structure that likely existed in this community prior to exploitation." Among other things, this prescription emphasize the following:

- Active and passive restoration of spruce and spruce-hardwood communities,
- Recovery of threatened and endangered species and other species of concern associated with spruce and spruce hardwood-communities



Sharp Knob II,
Red Spruce Restoration
Monongahela National Forest

# Exhibit B

## PARENT COMPANY GUARANTY

This **GUARANTY** ("Guaranty") is made as of _____, 2019 (the "Effective Date"), by **Consol Energy, Inc.,** a Delaware corporation ("Guarantor"), in favor of Ohio Valley Environmental Coalition, West Virginia Highland Conservancy, West Virginia Rivers Coalition and Sierra Club ("Beneficiaries") in connection with the Consent Decree, as entered by the United States District Court for the Southern District of West Virginia (the "Court") in Civil Actions 2:10-1199; 2:13-5006; 2:13-21588 (consolidated with 2:13-16044); and 2:15-1371 (the "Order") and the funding obligations thereunder of Fola Coal Company, LLC., ( "Counterparty").

### Recitals

**WHEREAS,** the Guarantor is the ultimate parent company of the Counterparty;

**WHEREAS,** pursuant to the Section VII of the Consent Decree, Guarantor has agreed to provide certain credit support to Counterparty;

**WHEREAS,** the Guarantor, Counterparty, and the Plaintiffs in the underlying Civil Action have developed this Guaranty to fulfill and satisfy the Order's requirement that sufficient funds be available to be drawn upon to meet or complete the projects covered by the Order.

### Terms and Conditions

**NOW THEREFORE,** in consideration of the premises and the mutual covenants, hereinafter set forth, the adequacy of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    **Guaranty.**  Guarantor does hereby unconditionally, irrevocably and absolutely guarantee to Beneficiaries the full payment by Counterparty to Beneficiaries under and pursuant to Sections V of the Order (as the same may be amended form time to time) and any related orders issued under and in connection with the Order (the "Related Orders") (referred to herein collectively as "Guaranteed Obligations"). Except as specifically set forth in Section 5 hereof, the total liability of Guarantor under or in connection with this Guaranty, regardless of any amendment, extension, supplement, variation, novation, ratification, replacement or other modification to the Order or any other order or act of the applicable court or other legal authority from time to time, is limited to the lesser of (a) Nine Million **(US $9,000,000.00)** in cash contributions (inclusive of all taxes, levies, imposts, deductions, charges and withholdings assessed, imposed, collected or withheld under any statute and, in each case, all interest, fines, penalties, charges, fees or other amounts in respect of them), or (b) the Guaranteed Obligations, which Guaranteed Obligations are anticipated to be reduced and/or eliminated during the term of this Guaranty as provided for in Paragraph 14 below. Guarantor's obligations and liability under this Guaranty shall be limited to payment obligations only, and Guarantor shall have no obligation to perform under the Order or any Related Orders.

2.    **Guaranty Absolute.**  Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Order and any Related Orders. The obligations of Guarantor under this Guaranty are independent of, but related to, Counterparty's

obligations under the Order and the Beneficiaries may seek enforcement of the Guaranty in accordance with Section 7 hereof. The liability of Guarantor under this Guaranty shall be irrevocable, absolute and unconditional.

Notwithstanding any provision to the contrary contained herein, Guarantor's liability hereunder shall be and is specifically limited to payments expressly required to be made in accordance with the Order and any Related Orders. In no event shall Guarantor be subject hereunder to any consequential, exemplary, equitable, loss profits, punitive, tort or any other damages, costs, or attorney's fees; provided however, that Guarantor may be subject to Beneficiaries reasonable court costs and associated fees if the Beneficiaries properly issues an order for payment under Section 7 hereunder, and Guarantor fails to make such payment.

This Guaranty shall continue to be effective if a Counterparty merges or consolidates with or into another entity, loses its separate legal identity, ceases to exist, becomes insolvent, or seeks bankruptcy protection.

This Guaranty is a continuing guaranty of the payment (and not of collection) by Counterparty of its obligations under the Order and any Related Orders. In no event shall Guarantor's liability to Beneficiaries exceed Counterparty's liability under the Order and any Related Orders, notwithstanding the effect of the insolvency, bankruptcy, or reorganization of a Counterparty.

Unless otherwise agreed by Beneficiaries, all payments under this Guaranty shall be made in the same currency that the applicable Guaranteed Obligations are denominated (the "Currency") and in immediately available funds (and no obligation or liability of the Guarantor under this Guaranty shall be released or discharged by any judgment in a currency other than the Currency) unless any judgment or order of the United States District Court for the Southern District of West Virginia is given or made for the payment of any amount due under this Guaranty in a currency other than the Currency.

3.    **Term.**  This Guaranty shall continue in full force and effect for a period of five (5) years commencing on the Effective Date or until the Counterparty has submitted documentation demonstrating that the Guaranteed Obligations have been satisfied and there is no further need for this Guaranty, whichever occurs first.  Notwithstanding the foregoing, the Guarantor and Beneficiaries may extend this Guaranty by mutual agreement in writing. Upon expiration of this Guaranty all Guaranteed Obligations shall cease, Guarantor shall be released from this Guaranty.

4.    **Waivers and Acknowledgments.**  Except as expressly provided herein, Guarantor hereby waives presentment, protest, acceleration, dishonor, promptness, diligence, filing of claims with a court in the event of insolvency or bankruptcy of Counterparty, notice of acceptance of this Guaranty and any other notice with respect to any of the Guaranteed Obligations and this Guaranty. Subject to the provisions of Section 3, Guarantor acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

Except as to applicable statutes of limitation, no delay of Beneficiaries in the exercise of, or failure to exercise, any rights hereunder shall operate as a waiver of such rights, a waiver of any other rights or a release of Guarantor from any obligations hereunder nor shall any single or partial exercise by Beneficiaries of any right, remedy or power hereunder preclude any other or future exercise of any right, remedy or power. Each and every right, remedy and power hereby granted to Beneficiaries or allowed it by law or other agreement shall be cumulative and not exclusive of any other, and may be exercised by Beneficiaries from time to time.

5.   **Reservation of Defenses.**  Guarantor agrees that, except as expressly set forth herein, it will remain bound upon this Guaranty notwithstanding any defenses which, pursuant to the laws of suretyship, would otherwise relieve a guarantor of its obligations under a guaranty. Guarantor does reserve the right to assert defenses which Counterparty may have to payment of any Guaranteed Obligation (but, for the avoidance of doubt, excluding defenses arising from the bankruptcy or insolvency of Counterparty and other defenses expressly waived hereby).

6.   **Notices.**  All demands, notices, and other communications provided for hereunder shall, unless otherwise specifically provided herein, (a) be in writing addressed to the party receiving the notice at the address set forth below or at such other address as may be designated by written notice, from time to time, to the other party, and (b) be effective upon receipt, when mailed by U.S. mail, registered or certified, return receipt requested, postage prepaid, or personally delivered.  Notices shall be sent to the following addresses:

|                       |                          |
|-----------------------|--------------------------|
| **If to Guarantor:**  | Matthew Tyree            |
|                       | Senior Counsel           |
|                       | CONSOL Energy Inc.       |
|                       | 1000 CONSOL Energy Drive |
|                       | Suite 100                |
|                       | Canonsburg, PA 15317     |
|                       |                          |
|                       | and                      |
|                       |                          |
|                       | Shane Harvey             |
|                       | Jackson Kelly PLLC       |
|                       | 500 Lee Street E         |
|                       | Suite 1600               |
|                       | Charleston, WV 25301     |

|  |  |
|---|---|
| **If to Beneficiaries:** | Mike Becher |
|  | Appalachian Mountain Advocates |
|  | P.O. Box 11571 |
|  | Charleston, WV 25339 |

and

Joe Lovett
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901

7.      **Demand and Payment.**  Any demand by Beneficiaries for payment hereunder shall be in writing, and shall (a) reference this Guaranty, (b) specifically identify Counterparty and Beneficiaries, the Guaranteed Obligations to be paid and the amount of such Guaranteed Obligations, and (c) set forth payment instructions.  There are no other requirements of notice, presentment or demand.  Upon receipt of a demand that satisfies these conditions, Guarantor shall pay, or cause to be paid, such Guaranteed Obligations within five (5) business days and shall not challenge its obligation to satisfy such demand prior to making such payment.

8.      **Payments Free and Clear of Taxes.**  All payments by Guarantor hereunder shall be made to the Beneficiaries free and clear of, and without deduction or withholding for, any and all present and future taxes, levies, duties or withholdings of any kind or, if any deduction or withholding for any such taxes, levies, duties or withholdings from any amount payable hereunder is legally required, such amount shall be increased as may be necessary so that after making all required deductions and withholdings, the Beneficiaries will receive an amount equal to the amount it would have received had no such deductions or withholdings been required; provided, however, that in no case shall Guarantor's payments hereunder exceed the cap on Guarantor's total liability hereunder as set forth in Section 1.

9.      **Representations and Warranties of Guarantor.**  Guarantor represents and warrants that:

(a)      it is a corporation duly organized and validly existing under the laws of Delaware and has the corporate power and authority to execute, deliver and carry out the terms and provisions of this Guaranty;

(b)      no authorization, approval, consent or order of, or registration or filing with, any court or other governmental body having jurisdiction over Guarantor is required on the part of Guarantor for the execution and delivery of this Guaranty;

(c)      The undersigned agree that the obligations within this Guaranty are not dischargeable through bankruptcy, and Guarantor agrees not to seek such discharge and will join Beneficiaries in efforts to avoid any such discharge.

(d)      this Guaranty constitutes a valid and legally binding agreement of Guarantor, except as the enforceability of this Guaranty may be limited by the effect of any

4818-8007-0253.v1

applicable bankruptcy of Guarantor, insolvency, fraudulent conveyance, reorganization, moratorium or similar laws affecting creditors' rights generally, general principles of equity whether considered in a proceeding in equity or at law, and an implied covenant of good faith and fair dealing, except as expressly provided herein.

10.    **Miscellaneous.**

   **(a)**    Assignment. Guarantor shall not assign this Guaranty without the express written consent of Beneficiaries and any purported assignment absent such consent is void.

   **(b)**    Severability. If any provision or portion of a provision of this Guaranty is declared void and/or unenforceable, such provision or portion shall be deemed severed from this Guaranty which shall otherwise remain in full force and effect, with the exception of the amount of Guarantor's liability as provided for in Section 1 above. The parties hereto shall endeavor in good-faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

   **(c)**    Amendments. No amendment of this Guaranty shall be effective unless in writing and signed by Guarantor and Beneficiaries. No waiver of any provision of this Guaranty nor consent to any departure by Guarantor therefrom shall in any event be effective unless such waiver shall be in writing and signed by Beneficiaries. Any such waiver shall be effective only in the specific instance and for the specific purpose for which it was given.

   **(d)**    Successors and Assigns. This Guaranty shall be binding upon Guarantor, its successors and permitted assigns and inure to the benefit of and be enforceable by Beneficiaries, its successors, and assigns.

   **(e)**    Prior Agreements. This Guaranty embodies the entire agreement and understanding between Guarantor and Beneficiaries relating to the subject matter hereof.

   **(f)**    Headings. The headings in this Guaranty are for purposes of reference only and shall not affect the meaning hereof.

11.    **Limitation by Law.** All rights, remedies and powers provided in this Guaranty may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law, and all the provisions of this Guaranty are intended to be subject to all applicable mandatory provisions of law that may be controlling and to be limited to the extent necessary so that they will not render this Guaranty invalid, unenforceable, in whole or in part, or not entitled to be recorded, registered or filed under the provisions of any applicable law.

12.    **Governing Law.** This Guaranty shall in all respects be governed by and construed in accordance with the laws of the State of Delaware.

4818-8007-0253.v1

13. **Consent to Jurisdiction.**  With respect to the Guaranty and any obligation that the Guarantor may have to the Beneficiaries, Guarantor hereby irrevocably submits to the jurisdiction of the Huntington Division of the United States District Court for the Southern District of West Virginia over any suit, action or proceeding arising out of or relating to the Guaranteed Obligations or Guarantor's obligation to make any payment pursuant to this Guaranty. Guarantor hereby irrevocably waives, to the fullest extent permitted or not prohibited by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. The parties hereby agree that a final judgment in any such suit, action or proceeding brought in such a court, after all appropriate appeals, shall be binding upon it. This consent to jurisdiction shall not apply to any dispute regarding the Guaranty between Guarantor and any party other than the Beneficiaries.

14. **Amendments to Reflect Annual Reduction in the Guaranteed Obligations.**  The Counterparty and/or Guarantor, as the case may be, may request an amendment to this Guaranty on an annual basis to update Paragraph 1, above, to reflect the amount of the Guaranteed Obligation remaining after giving effect to payments made through the date of the requested amendment.  Beneficiaries consent to the amendment may not be unreasonably withheld.  For the avoidance of doubt, nothing in this paragraph contradicts or supersedes Paragraph 1, above, and at no time shall the Guaranteed Obligations exceed the amount of cash payments that Counterparty has yet to satisfy, regardless of whether Guarantor has ever requested an amendment under this paragraph or whether Beneficiaries has consented to such amendment.

**[Signature page to follow.]**

**IN WITNESS WHEREOF,** Guarantor has caused this Guaranty to be duly executed and delivered by its duly authorized representative and Beneficiaries have acknowledged receipt of this Guaranty.

Guarantor:   **Consol Energy, Inc.**

Name:_____

Title:_____

Date:_____

Beneficiaries: **Ohio Valley Environmental Coalition, West Virginia Highland Conservancy and Sierra Club**

Name:_____

Title:_____

Date:_____